280 So.2d 913 (1973)
Robert E. O'DELL
v.
INTERNATIONAL PAPER COMPANY.
No. 52589.
Supreme Court of Louisiana.
June 11, 1973.
Rehearing Denied August 20, 1973.
*914 Stewart & Stewart, Dan W. Stewart, III, Minden, Madison, Files, Garrett, Brandon & Hamaker, H. Flood Madison, Jr., James P. Madison, Monroe, for defendant-respondent.
Henry G. Hobbs, Stephen R. Burke, Minden, for plaintiff-applicant.
BARHAM, Justice.
Plaintiff Robert E. O'Dell injured his back in the scope and course of his employment with International Paper Company, Container Division, Springhill, Louisiana, on May 13, 1964. The injury proved to be of a permanent and total nature. On May 14, 1964, defendant began paying plaintiff $54.00 per week in benefits: $35.00 as the maximum payment required by R.S. 23:1202 (as amended in 1956) for workmen's compensation, and $19.00 as supplemental payment made pursuant to an agreement between plaintiff's union and defendant.
Defendant discontinued the $19.00 supplemental payments on April 10, 1965, when plaintiff's injuries were determined to be total and permanent. However, it continued the $35.00 per week payments for the statutory period, 400 weeks, under R.S. 23:1221(2).
Plaintiff sued International Paper on October 6, 1967, for the remaining 354 weeks of supplemental payments of $19.00 per week which it allegedly owed him. Plaintiff contends that the right to receive the supplemental payments is tied to the right to receive workmen's compensation; both types of payments are paid directly by defendant, which is self-insured for workmen's compensation liability.
International Paper defended on the bases that the supplemental payments were due only for 26 weeks, and that plaintiff's exclusive remedy was the arbitration procedure agreed upon by the defendant and the plaintiff's union.
The district court concluded that plaintiff was not required to submit his claim to arbitration. It also found that the 26 weeks' limitation did not apply to supplemental benefits, and ordered defendant to pay O'Dell the additional $19.00 per week during the period of his disability. The appellate court reversed, holding that the grievance procedure was plaintiff's exclusive remedy, that he had failed to exhaust it, and that his claim was thus considered settled. At relator's request we granted writs to review the decision of the Court of Appeal, 262 So.2d 101.
The procedure governing the arbitration of disputes is set out in a document entitled "Labor Agreement, Georgetown-Springhill Plants, Contract Years 1963-65". Plaintiff originally contended that the supplemental benefit payments were analogous to wages and thus were exempt from arbitration under the express provision of the labor agreement that "The matter of wages is not to be a subject of arbitration". Nonetheless, following the filing of an exception of prematurity by defendant on November 2, 1967, on the ground that the grievance procedures had not been complied *915 with, O'Dell attempted to get the union to arbitrate the dispute. On January 24, 1968, Shelby Phillips, the union representative, wrote to E. P. Dennehy, assistant manager of the industrial relations department of International Paper, asking whether the arbitration procedure applied to O'Dell's case. On February 1, 1968, a formal complaint was filed. This grievance was denied by the company, and no further action was taken by the union.
Since the union, by the terms of the contract, is the sole bargaining agent for the employees, plaintiff now contends that he is entitled to pursue his grievance in the courts because of the perfunctory manner of the union in handling the complaint. we think that plaintiff's contention has merit. By the terms of the grievance procedure, the union is the agent for the processing of complaints. Section VII (B) of the labor agreement reads: "It is understood and agreed that a Local Union has the right to process a complaint on behalf of any employee or group of employees represented by it." In this instance the union pursued the matter only to the first stage and then let it drop. Plaintiff should not be left without a remedy because of the union's wrongful refusal to prosecute his claim. The Court of Appeal erred in holding that plaintiff had failed to exhaust the grievance procedure. O'Dell did all that was permitted him under the bargaining contract and all that was required of him under the rule promulgated by the United States Supreme Court in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed. 2d 842 (1967):
"* * * However, because these contractual remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable for the individual grievant. The problem then is to determine under what circumstances the individual employee may obtain judicial review of his breach-of-contract claim despite his failure to secure relief through the contractual remedial procedures. * * *
"We think that another situation when the employee may seek judicial enforcement of his contractual rights arises if, as is true here, the union has sole power under the contract to invoke the higher stages of the grievance procedure, and if, as is alleged here, the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's wrongful refusal to process the grievance. * * *
Since the union was negligent in its processing of the grievance, plaintiff is thus entitled to pursue his claim in the courts according to the Vaca rule.
As to the matter of supplemental benefits, in the 1954 contract negotiations between the union and International Paper the discrepancy between the benefits received for non-work-related injuries and work-related injuries was pointed out. At that time the benefits for non-work-related injuries compensated by health insurance were greater than those paid for workmen's compensation injuries. As a result of this discrepancy, a provision was inserted in the 1954 contract to correct the situation. It read as follows:
"In those states where the Workmens Compensation for occupational injury results in payments of less than $28.00 weekly, the company will pay the difference between $28.00 weekly and the weekly Workmens Compensation due. This will apply only during the period an employee loses time from work because of such an occupational injury and does not apply to any settlements because of death, dismemberment, partial or permanent disabilities." (Emphasis here and hereafter has been supplied.)
The amount received as supplemental benefits was increased from time to time so that at the time of plaintiff's injury the total was $54.00 a week ($35.00 for workmen's *916 compensation and $19.00 in supplemental benefits).
The defendant now contends that the company's health insurance policy limit of 26 weeks of benefits applies to the supplemental payments made with workmen's compensation. However, no document in the 1954 contract, or any subsequent contract, shows such a limitation. Defendant's witness Martin J. Walter, of the industrial relations department of International Paper, testified that such a limit was intended to be incorporated by reference, but admitted there was no express agreement. He also admitted that he was not present at the 1954 contract negotiations and said that he had in fact been hired only in 1966.
Walter also testified that there were at least six other instances at the Springhill plant where employees were compensated with supplemental benefits in excess of 26 weeks. Billy Jennings, personnel supervisor of the Springhill plant, testified that one claimant had been paid for one and a half to two years. B. M. Thompson, general manager of the plant, also testified that some workmen's compensation claimants had received supplemental benefits for periods exceeding 26 weeks. The inconsistency of the company's position is further evidenced by the fact that both the workmen's compensation and the supplemental benefits were paid entirely by International Paper as a self-insurer; its health insurer paid nothing to the workmen's compensation claimants.
The only valid limitation on the supplemental benefits is that found in the contract itself: "* * * This will apply only during the period an employee loses time from work because of such an occupational injury and does not apply to any settlements because of death, dismemberment, partial or permanent disability." There was no settlement in this case, and thus plaintiff was entitled to supplemental benefits during the period of his injury.
In summary, the Court of Appeal erred in holding that plaintiff had not exhausted his grievance remedies. Plaintiff had presented his claim to the union, the agent for processing complaints, which then prosecuted the grievance only perfunctorily. This wrongful refusal by the union clearly brings plaintiff under the rule of Vaca v. Sipes, supra; he is thus entitled to pursue his claim in the courts.
International Paper's contention that supplemental benefits to workmen's compensation claimants are limited to 26 weeks is also without merit. The company was a self-insurer for both such payments. The only limit on the payments is that found in the contract itself, which is specifically confined to settlements. Walter's testimony that the insurance policy limit of 26 weeks was intended to be incorporated by reference into the labor contract is unacceptable in view of the fact that he was not present at the contract negotiations and in fact admitted that the 26 weeks' limit had not been observed.
For the reasons assigned the judgment of the Court of Appeal is reversed, and the judgment of the district court reinstated. All costs are cast against the defendant.
SANDERS, C. J., dissents for the reasons assigned by SUMMERS, J.
SUMMERS, J., dissents and assigns reasons.
MARCUS, J., dissents for reasons assigned by SUMMERS, J.
SUMMERS, Justice (dissenting).
Prior to 1954 defendant, International Paper Company, Container Division, maintained a group policy with Metropolitan Life Insurance Company to provide insurance for its employees for sickness and accident not incurred during the course and *917 scope of their employment. The policy provided for weekly payments not to exceed 26 weeks. As a result, some employees who were disabled by non-occupational sickness or accident received larger payments than employees disabled by workconnected accidents under the Workmen's Compensation Act. Finding these conditions to be incompatible with acceptable compensation standards, the International Brotherhood of Pulp, Sulphite and Paper Mill Workers and its Locals at Georgetown, South Carolina, and Springhill, Louisiana, designated this problem as part of its forthcoming negotiations of a labor agreement with International Paper Company.
At the meeting held to negotiate the labor contract, the union proposed: "Increase maximum for sickness and nonoccupational accidents under group insurance plans from $26 to $28 per week." It was also proposed: "Company to pay difference between workmen's compensation and $28 per week."
On July 13 and 14, 1954, it was agreed that the maximum amount of sickness and nonoccupational accident benefits under the group insurance plan be increased from $26 to $28 per week at no additional cost to the employee. It was further agreed:
In those states where the workmen's compensation for occupational injury results in payments of less than $28 weekly, the company will pay the difference between $28 weekly and the weekly workmen's compensation due. This will apply only during the period an employee loses time from work because of such an occupational injury and does not apply to any settlements because of death, dismemberment, partial or permanent disabilities.
By supplements and amendments to the labor contract, the payments under the group policy for sickness and nonoccupational accidents were increased to $54 per week. Appropriately, supplemental payments to employees disabled by occupational accidents were also increased to make up the difference between workmen's compensation payments and $54 per week.
In time the practice developed whereby the company no longer adhered to the 26 week limitation for supplemental payments. Instead, it became the practice to continue supplemental payments along with workmen's compensation until a doctor certified that the man had achieved maximum medical recovery. This would mean one of two things, the doctor would either certify that the man was capable of going back to work or the doctor would certify that the employee was totally and permanently disabled. This practice was financed by the company which was self-insurer for the supplemental payments beyond 26 weeks, and for all workmen's compensation payments.
The terms of the labor agreement applicable during the years 1963 to 1965 also contained detailed provisions for adjustment of complaints arising in the plants affected. Exercise of rights under the grievance and arbitration procedure could be either by the employee or a union representative. These provisions required an earnest effort to be first made to settle the complaint informally and personally between the aggrieved employee and/or the union steward and his foreman. If the complaint was not settled informally, the aggrieved employee and/or his steward must present the complaint to the department foreman within five days after the cause for complaint became known.
If the department foreman failed to adjust the complaint in a satisfactory manner, the matter was then to be reduced to writing within ten days after receipt of the department foreman's answer, and referred to the plant superintendent, who would then meet with the union committee. In the event of an unsatisfactory reply, it was provided that a meeting was to be had with the international representative of the union and his committee. Thereafter, within five days, the matter was to be referred to *918 the general manager of the division. If a satisfactory settlement was not reached by the general manager and the international representative, the matter was required to be submitted to an impartial arbitrator. He was to hear the evidence and render a decision within thirty days, the decision to be final and binding on the parties.
The labor contract further provided that wages would not be the subject of arbitration.
Employees, under the contract, were entitled to representation by the union, which was recognized as the sole agency representing employees for collective bargaining.
Plaintiff, R. E. O'Dell, was injured on May 13, 1964, while employed by the Container Division of International Paper Company in Springhill, Webster Parish. At that time the prevailing rate of workmen's compensation was $35 per week. In keeping with the requirements of the Workmen's Compensation Act and the quoted labor contract provision for supplemental payments, O'Dell received $54 per week$35 per week as workmen's compensation and $19 per week as a supplemental payment. These payments were made until it was determined that O'Dell's injuries were total and permanent. When this status was certified on June 17, 1965, the defendant employer discontinued the supplemental payments of $19 per week. However, O'Dell continued to receive $35 per seek as workmen's compensation.
A controversy then arose over the discontinuance of the supplemental payments. O'Dell contended there should be no limitation on the time during which these payments should be made, taking the position they should be paid as long as workmen's compensation was due. Defendant contended, on the other hand, that the group sickness and accident policy it held with Metropolitan Life Insurance Company providing for supplemental payments was an inseparable part of the entire understanding. As such, it must be construed together with the provisions of the labor contract entered into on July 13, and 14, 1954 as subsequently amended and supplemented. Under this latter position, the 26 week contract limitation on supplemental payments applies to O'Dell, and since weekly payments were made from May 13, 1964 to June 17, 1965, far in excess of 26 weeks, no further supplemental payments are due to him.
When O'Dell ascertained after demand that the supplemental payments would not be made, he instituted this suit on October 6, 1967, to recover $19 per week for approximately 350 weeks, the time remaining during which workmen's compensation was due.
Pleas of prematurity and prescription were filed by defendant. The plea of prematurity filed on November 2, 1967, is based upon the contention that the adjustment of all complaints between the employee and the company were required to be processed through the grievance procedure to the ultimate remedy which was arbitration. Plaintiff had not pursued his complaint through arbitration, as required by the labor contract, it was asserted, and he was without right to bring this action and the suit was premature.
After this plea was filed, and before the ruling on this plea or the plea of prescription, plaintiff's attorney wrote to the union local setting forth that the company contended his complaint should, under the labor contract, be submitted to arbitration. The letter was referred to the international representative of the union. He in turn wrote to the assistant manager of the company on January 24, 1968, about the company's policy on supplemental payments. His letter set forth that O'Dell complained that other employees had received supplemental payments during the entire time workmen's compensation was being paid, whereas his supplemental payments had been terminated when it was ascertained that he was totally and permanently disabled and would no longer return to his *919 employment. The letter then requested arbitration if the company's policy provided for the $19 per week supplemental payments.
Shortly thereafter, on February 1, 1968, the union filed a formal complaint asking that the company treat O'Dell like everyone else who had been disabled due to a company accident, and show no discriminatory acts toward any disabled employee. So far as we can ascertain, no further steps were taken either by O'Dell or the union leading to arbitration.
On August 21, 1970, the exceptions of prematurity and prescription were overruled. When the case was tried on April 8, 1971, plaintiff offered the record and rested. Other than the documents obtained by O'Dell in response to subpoenaes duces tecum and in answers to interrogatories, the company's witnesses established the recited facts.
The trial court rendered judgment in O'Dell's favor condemning the company to pay $19 per seek as supplemental payments so long as O'Dell was entitled to workmen's compensation payments. This judgment was reversed by the Second Circuit, 262 So.2d 101. That Court rejected O'Dell's contention that the supplemental payments were wages, and, under the labor contract, were not the subject of arbitration. The court further held that plaintiff failed to pursue the grievance procedure to arbitration as required by the labor contract, and he had no standing in court to seek redress of a grievance which he had agreed to arbitrate by the union contract. Certiorari was granted on plaintiff's application, 262 La. 307, 263 So.2d 46.
If the supplemental payments are wages, they are not subject to arbitration by the plain terms of the contract. In such an event, plaintiff is properly in court. If the supplemental payments are not wages, however, the question is whether O'Dell is bound by the terms of the labor contract to arbitrate his complaint that the supplemental payments were improperly terminated.
Louisiana recognizes that a provision in a written contract to settle by arbitration a controversy thereafter arising out of the contract or out of the refusal to perform the whole or any part thereof, shall be valid, irrevocable, and enforceable, save such grounds as exist in law or equity for the revocation of any contract. La.R.S. 9:4201. The provisions of our arbitration laws, however, do not apply to contracts of employment of labor or to contracts for arbitration which are controlled by valid legislation of the United States. La.R.S. 9:4216.
Congress has in fact enacted the Labor Management Relations Act (National Labor Relations Act, 1947), 29 U.S.C.A. §§ 141-181, regulating the subject matter of this controversy.
The principle at the very heart of the national labor policy has been the promotion of voluntary agreements between employers and organized labor. Congress has sought to implement this principle through the systemization of collective bargaining agreements under the National Labor Relations Act. The Supreme Court has supplemented this development by encouraging peaceful settlement of industrial disputes through the process of arbitration, which has become a "kingpin of federal labor policy." Today some form of arbitration clause is in 94% of all collective bargaining agreements. Each one of these collective bargaining agreements is more than a contract; each is an attempt to create an instrument of industrial self-government. (Azoff, Joint Committees As An Alternative Form of Arbitration Under National Labor Relations Act, 47 Tul.L. R. 325 (1973)).
In a trilogy of cases decided in 1960 the Supreme Court explicated its policy for courts in arbitration cases: United Steel workers of America v. American Manufacturing Co., 363 U.S. 564; United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. *920 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed. 2d 1424. In the Warrior case, the Supreme Court said:
The Congress, however, has by Sec. 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

. . . . . .
... In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. (363 U.S. 582, 80 S.Ct. 1353, emphasis added).
Under the principles announced, the parties to a labor agreement can, by an arbitration provision in the agreement, in effect oust the courts of jurisdiction to hear and decide a dispute which would, but for the arbitration provision, be a case of alleged breach of contract by one of the parties cognizable in a court if the aggrieved party should resort to a court. Desert Coca Cola Bottling Co. v. General Sales Drivers, etc., 335 F.2d 198 (9th Cir. 1964).
Counsel for O'Dell takes the position that while the supplemental payments are not wages per se, they are analogous to wages and should be excluded from arbitration and grievance procedure, especially since the union never contracted to make these payments subject to arbitration and grievance procedure.
A copy of the company's basic hourly wage rate schedule was attached to the labor contract. This referred in detail to the wage rate for the various union employees. The labor contract contained a provision that the same should remain in effect throughout the life of the agreement unless changed by mutual consent of the parties at a meeting duly called. The exclusion in question follows immediately after the foregoing provision in these terms: "The matter of wages is not to be subject to arbitration." The wage rate schedule are the "wages" we feel the contract excluded from arbitration. Nowhere in this wage rate schedule are supplemental payments mentioned or otherwise alluded to in any manner.
Language of the Supreme Court in United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) is pertinent to this interpretation. There the court said, "Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement." See also United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).
In the context of this case, therefore, it is my opinion that the exclusion of "wages" from the broad grievance and arbitration provisions of the contract had reference to wages as contemplated in the "wage rate schedule", not to supplemental *921 payments made on account of non-occupational disability.
The contention that O'Dell cannot resort to the courts because he has failed to pursue the grievance and arbitration procedure contracted for is also meritorious.
As a general rule in cases in which federal law applies, federal labor policy requires that individual employees wishing to assert grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress. This rule serves the union's interest in prosecuting employee grievances. It compliments the union's status as exclusive bargaining representative by permitting it to participate actively in the continuing administration of the contract, enhancing the union's prestige with the employee. A contrary rule permitting an individual employee to sidestep available grievance procedure in favor of a lawsuit has little to commend it. If grievance procedure is not exclusive, it loses its effectiveness and desirability as a method of settlement. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).
I think the applicability of the arbitration procedure to this case is illustrated by the resort to that procedure by O'Dell. It was only the failure to pursue that procedure to a conclusion which leave the merits of his claim unresolved.
O'Dell's contention is mainly that the union has not conscientiously pursued the grievance procedure to the final stages of arbitration. He says the union representative gave the matter a perfunctory treatment. Notwithstanding the strong policy favoring arbitration, an employee who has a legitimate grievance and who is confronted with the defense that he failed to exhaust arbitration as required by the contract may bring an action in law provided he can establish by adequate proof that the union, as bargaining agent, breached its duty of fair representation in handling the employee's grievance. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1963).
There is no evidence whatsoever that the union representative here breached its duty of fair representation. To hold that they did would require rank speculation to arrive at a conclusion patently against the union's interest. Furthermore, as I understand the contract, there was no prohibition against the employee pursuing the grievance to arbitration himself. It does seem to be a fair inference, however, that the union representative found O'Dell's claim for continuing supplemental payments to be unfounded, and, for this reason, he declined to pursue the matter further. Certainly, no affirmative evidence in the record supports a finding that the union representative was arbitrary, discriminatory or in bad faith. In the absence of such a finding, arbitration must be utilized. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).
Actually, the claim for supplemental payments was, in its inception, limited to 26 weeks. It was only a unilateral liberal attitude of the company which extended the payments beyond 26 weeks to a point where the employee had attained maximum medical recovery so that he could either return to work or until he could no longer be classified as an employee. In O'Dell's case, the payments over a period of 56 weeks are far in excess of the supplemental payments contemplated by the contract.
Plaintiff's remedy in this case was by arbitration. The policy of Congress and decisions of the United States Supreme Court do not permit interference by the courts except in instances where the union representative has failed to conscientiously pursue the remedy by arbitration. No showing supports such a finding.
In my view, plaintiff's suit should be dismissed at his cost.
I respectfully dissent.