721 So.2d 983 (1998)
Gail A. WINKLE, Plaintiff-Appellee,
v.
ADVANCE PRODUCTS & SYSTEMS, INC., Defendant-Appellant.
No. 98-694.
Court of Appeal of Louisiana, Third Circuit.
October 28, 1998.
*985 Peter C. Piccione, Jr., Lafayette, for Gail A. Winkle.
Bernard Seymour Smith, Lafayette, for Advance Products & Systems, Inc.
Before DECUIR, AMY and PICKETT, JJ.
AMY, Judge.
The plaintiff filed suit against her employer, seeking vacation pay claimed to be due her as "wages," penalty wages, and attorney's fees. Following a bench trial, judgment was rendered for the plaintiff. The defendant appeals, urging error in the lower court's determination. We affirm in part, and reverse in part.

Factual and Procedural Background
The record reveals that the plaintiff, Ms. Gail Winkle, was employed by the defendant, Advance Products & Systems (APS), in their Operations Department from October 19, 1992, until October 27, 1995. She was officially terminated on October 30, 1995, at which time her supervisor, Mr. Rick Lavergne, presented Ms. Winkle with her final paycheck. When Ms. Winkle asked Mr. Lavergne whether that check included any vacation time she claimed due her, he responded negatively.
On February 8, 1996, Ms. Winkle's attorney sent a certified letter to APS, requesting Ms. Winkle's claimed vacation time and penalties as provided by law. When Ms. Winkle did not receive payment from APS, she authorized her attorney to file suit. The instant litigation resulted, with Ms. Winkle claiming vacation pay due her under La.R.S. 23:631, along with penalty wages and attorney's fees under La.R.S. 23:632.
After a bench trial on the matter, the trial court found APS owed Ms. Winkle for her earned, but unused, vacation time, as this was found to constitute an amount due under the terms of employment. The court found APS failed to prove the existence of any policy prohibiting payment upon termination for unused vacation, but even if such a policy existed, the court found it void under La.R.S. 23:634. The trial court also awarded Ms. Winkle penalty wages under La.R.S. 23:632, as it found APS to be in bad faith in its failure to pay her earned vacation pay, and also awarded her attorney's fees under that same statute.
APS appeals from this judgment, urging the following assignments of error:
(1) That the trial court was manifestly erroneous in holding that vacation time for an "at will" employee was a "wage" under La.R.S. 23:631 and in holding that defendant's policy against payment of vacation time upon termination of employment to be against public policy, even if said discharge was for cause.
(2) That the trial court was manifestly erroneous in allowing Marla Ratzlaff to testify as a witness when she had never been named as such until the start of trial.
(3) That the trial court was manifestly erroneous in finding that APS did not have a policy regarding non-payment of vacation time upon discharge or alternatively APS did not present "any evidence"which established "factually and decisively" that plaintiff ever received notice of such policy.
(4) That the trial court was manifestly erroneous in failing to give credit to defendant *986 for the sick time erroneously paid plaintiff.
(5) That the trial court was manifestly erroneous in finding defendant not to be in good faith.
(6) That the trial court was manifestly erroneous in assessing attorney fees against defendant and the amount of same.
(7) That the trial court was manifestly erroneous in failing to compel plaintiff from providing a medical release to obtain the records of the doctors she had gone to during her time of employment with APS.

Discussion of the Merits

Vacation time as "wages" under La.R.S. 23:631
In brief Ms. Winkle urged that this issue has been resolved by the Louisiana Supreme Court in Beard v. Summit Institute for Pulmonary Medicine & Rehabilitation, Inc., 97-1784 (La.3/4/98); 707 So.2d 1233. APS concedes that Beard settles the question that if an employer provides for vacation time, it is violative of La.R.S. 23:634 for the employer to mandate the forfeiture of this time, except possibly in very narrow circumstances. However, APS seeks to distinguish the present case from Beard, as APS allegedly has a policy that precludes post-termination payment for unused vacation time, while the employer in Beard allowed employees to accrue unused vacation time and to be paid for it upon termination of employment.
The threshold question presented for review is whether vacation pay is a "wage," or "an amount then due under the terms of employment" under La.R.S. 23:631(A)(1)(a). That statute provides, in pertinent part:
Upon the discharge of any ... employee..., it shall be the duty of the person employing such ... employee to pay the amount then due under the terms of employment... not later than three days following the date of discharge.
The most recent supreme court case involving this issue is Beard, 97-1784; 707 So.2d 1233. In Beard, the plaintiff, a licensed practical nurse employed by Summit, walked off the job and never returned to work. Summit's personnel policy contained the following provision: "[W]hen an employee walks off the job without cause or voluntar[ily] resigns without notice, he or she is deemed to have abandoned his or her position." Id. at p. 1-2; 1234. Additionally, the policy contained a forfeiture provision, whereby Summit employees would "forfeit all accrued benefits" if they "abandoned their position." Id. at p. 2; 1234. When Ms. Beard requested her accrued vacation pay, Summit refused, claiming she had abandoned her position, and, therefore, forfeited her right to vacation pay under Summit's policy. Id.
In Beard, the court held that "accrued vacation time is an `amount then due under the terms of employment' and constitutes wages under La. R.S. 23:631." Id. at p. 5; 1235. In so holding, the court noted that "every court of appeal that has addressed the issue has held that accrued vacation pay is wages under La. R.S. 23:631." Id. at p. 4-5; 1235 (citations omitted).
The next question presented for review is whether the vacation time at issue has "accrued." "Accrued" means "vested." Black's Law Dictionary 37 (4th ed.1968). "A vested right is defined as that case when `the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest.'" Macrellis v. Southwest Louisiana Independence Center, 94-1155, 94-1156, 94-1157, p. 4 (La.App. 3 Cir. 5/3/95); 657 So.2d 135, 137 quoting Berteau v. Wiener Corp., 362 So.2d 806, 808-809(La.App. 4 Cir.), writ denied, 365 So.2d 242 (La.1978). "[W]hen an employer promises a benefit to employees, and employees accept by their actions in meeting the conditions, the result is not a mere gratuity or illusory promise but a vested right in the employee to the promised benefit...." Baudoin v. Vermilion Parish School Bd., 96-1604, p. 5 (La.App. 3 Cir. 4/2/97); 692 So.2d 1316, 1319 (quoting Knecht v. Board of Trustees for State Colleges and Universities and Northwestern State Univ., 591 So.2d 690 (La.1991)), writ denied, 97-1169 (La.6/20/97); 695 So.2d 1358.
The record reveals that APS's vacation policy was that an employee was given one *987 week of vacation after one year of employment and two weeks of vacation after two years of employment. As the trial court found, this vacation was earned upon the employee's anniversary date. Upon that anniversary date, the employee had the right to enjoyment of his or her vacation. By working for APS for two years, Ms. Winkle accepted the company's promise of two weeks vacation. She, therefore, had a vested right to her vacation under Macrellis and Baudoin. As such, her vacation time had accrued, thereby bringing this case under the ambit of Beard. We, therefore, find this assignment of error lacks merit.

APS's policy regarding forfeiture of vacation time
APS urges that non-payment of vacation time upon termination of employment has been the company policy since the time of its founding. It further states that this company policy was set forth in an interoffice memorandum in 1992.
Ms. Winkle, however, submits that APS's own witnesses were not clear as to what the company's vacation policy was. She also states that the 1992 memo did not become part of the APS policy manual until she was discharged in October of 1995.
The applicable statute is La.R.S. 23:634(A),[1] which provides in pertinent part:
No person ... shall require any of his employees to sign contracts by which the employees shall forfeit their wages if discharged before the contract is completed...; but in all such cases the employees shall be entitled to the wages actually earned up to the time of their discharge or resignation.
The Louisiana Supreme Court interpreted this statute in Beard, 97-1784; 707 So.2d 1233, as prohibiting an employment policy or a signed employment contract that requires the forfeiture of wages, including accrued vacation time. Id.
The record reveals a great amount of testimony on this issue. Much of it focused on an interoffice memorandum, dated September 7, 1992, and signed by Thomas Forlander, the president and sole owner of APS.
Ms. Winkle testified that the policy of non-payment for unused vacation time was not the company policy during her employment with APS. Carol Kincel, an APS accounting employee who was generally in charge of typing company policy, testified that she did not specifically know to whom this policy revision was distributed. Marla Ratzlaff, a former APS employee, testified that she did not see the September 7, 1992 memo regarding non-payment of vacation pay in 1992. She stated that she saw it after Ms. Winkle left, but not before that time. She further referred to this policy as the "Gail revision," naming it after Ms. Winkle.
However, Thomas Forlander testified that the policy of APS since the beginning of the company was that unused vacation time would not be paid upon termination. It was a benefit that was just lost. He also testified that it was possible for him to tell the court that his sixty to seventy employees have received all of the company policy revisions and attachments, although there was no record of employees' receipt of these in his company. When asked why the September 7, 1992 memo had not been included in the body of the February 1, 1994 policy, he testified that they did not have time to retype the policy. Michael Mier, APS's inside sales supervisor, testified that he knew of no employee who had ever been paid for unused vacation time when he or she left employment. Gary Simon, APS's Production supervisor, testified that his understanding of the vacation policy was that the employees did not get paid for unused vacation time. He further testified that, when he was in charge of personnel, an employee had approached him about getting paid for her vacation time when she quit. Mr. Forlander told him that the policy of APS was not to pay for unused vacation time. Rick Lavergne, head of the Operations Department and Ms. Winkle's supervisor at the time of her termination, testified that vacation time was a benefit of employment. *988 When an employee was fired or resigned, vacation time was forfeited.
Upon review of the conflicting testimony in the record concerning APS's alleged policy of non-payment of vacation time, we find no manifest error in the trial court's determination that APS did not have such a policy, or, alternatively, that APS did not present evidence which proved factually and decisively that Ms. Winkle ever received notice of such policy. Furthermore, even if there were manifest error, since Beard controls this issue and holds that La.R.S. 23:634 prohibits such an employment policy, this assignment is without merit.

Propriety of Marla Ratzlaff's testimony
APS in brief urges that the only information it had regarding the testimony of this former APS employee was an "off handed remark" in Ms. Winkle's deposition. It further asserts that she was not listed in the pretrial order which stipulated the names of the witnesses to be called.
Ms. Winkle argues that it is within the trial court's discretion to admit or deny the testimony of any given witness, as it is the trier of fact who determines what witnesses and evidence are to be presented at trial. Furthermore, she asserts that, since APS was aware of the potential of Ms. Ratzlaff's being called as a witness, there was no surprise.
Excerpts from the trial court colloquy concerning Ms. Ratzlaff's testimony follow:
MR. SMITH: Your Honor, we just had a pre-trial conference. I have asked Mr. Piccione repeatedly the name of the witnesses. We just had a pre-trial. I asked him again the names of the witnesses to make sure there was nono difference in the response to pre-trial referring to witnesses. He's now called two (2) additional witnesses that are not on the pre-trial. We are not prepared today for these two (2) additional witnesses. We have had no notice of it. I've asked Mr. Piccione repeatedly for the name of the witnesses. I affirmed it again before this Court this morning, that there were no additional witnesses outside of this pre-trial because we are not prepared to meet any additional witnesses.
One of the witnesses I knowwe know they're hostile witnesses, and we would have prepared questions with respect to those witnesses. And
THE COURT: Mr. Piccione?
MR. PICCIONE: Your Honor, I believe we did, in fact, advise Mr. Bernard
....
MR. PICCIONE: Your Honor, if I may, in Ms. Winkle's deposition taken by Mr. Bernard on October 11, '96, he specifically asked Ms. Winkle what people from our office would you call, and she mentioned Marla Eghdal, who is now Marla Ratzlaff. And that was in her deposition in October of '96. So as a last-ditch effort
THE COURT: October of '96. I'll You know, it's not the intent to useto let procedural rules create an unfair advantage, but there is alsothe procedural rules are there for a particular reason.
In view ofMr. Smith, can you deny that you knew that this person was going to be aor potentially was a witness in this matter?
MR. SMITH: Absolutely, Your Honor.
THE COURT: In view of what's presented
MR. SMITH: If you want to go through the whole deposition, because, one, I had repeatedly asked Mr. Piccione who his witnesses were. I've asked her in her depositionif you want to go throughI'll be glad to go through the deposition. I asked the witness, "I don't know. I don't know. I may call anybody."
THE COURT: No, but wait.
MR. PICCIONE: The name was mentioned.
THE COURT: This name is mentioned.
MR. SMITH: Sure, she mentioned it, but she mentioned lots of different people. She said her whole office. She says her whole office.
THE COURT: The purpose of this whole pre-trial stuff is to make sureis to prevent surprise. And when you'reNow, you may not have gotten the formal notice, but, basically, the procedural aspects of the *989 case is basically form and the actual taking of testimony being the substance. We try not to let form take precedence over substance. But in this case, in view of that particular item, I will
MR. SMITH: Wait, Judge. Let me argue then. I didn't think he was going to reopen it. First of all, you said as a pretrial stipulation, and you said, "Any witness not listed on this list will notwill not be allowed to testify."
Now, if he sends me a list and he says, "These are the only people," and the penalty under this says if you don't list them, I'm not going to call them.
THE COURT: Well, wait. I can choose to enforce that if I choose to do so, and I can choose to ignore all of those rules. Now, if you really want to get into an argumentmy purpose of that is to prevent surprise. You had notice. I'll allow
MR. SMITH: I didn't have notice.
THE COURT:Marla Ratzlaff to testify.
The pretrial order controls the subsequent course of proceedings, unless it is modified at trial to prevent injustice. La.Code Civ.P. art. 1551. The trial judge has much discretion in this matter. Melancon v. J.B. Thibodeaux, Inc., 557 So.2d 256 (La.App. 3 Cir. 1989), writ denied, 558 So.2d 586 (La.1990).
In the proceedings below, the trial judge noted the purpose of his pretrial stipulation that any witness not listed would not be allowed to testify was to prevent surprise. He further concluded, however, that APS did have notice of Ms. Ratzlaff's potential testimony. Given this finding regarding notice and the trial court's much discretion in this area, we find this assignment meritless.

Entitlement to credit for overpaid sick time
In support of its proposition that it is entitled to a credit for overpayment of sick time to Ms. Winkle, APS states in brief that Ms. Winkle was recording more sick time on her time cards than the company allowed, and she was erroneously paid for this sick time. Additionally, APS contends Ms. Winkle falsified her time cards to show she was at work when, in actuality, she was at a doctor's appointment. APS also states that Ms. Winkle had taken over two weeks of sick time, for which there was no support by any doctor's visits.
Ms. Winkle urges that APS had neither a written policy nor any guidelines requiring an employee to verify that he or she actually saw a physician when that employee took a sick day. She also urges APS failed to prove any credit due as an offset for its claim.
"A party that properly pleads setoff as an affirmative defense has the burden of proof of the claim. The defense of setoff requires mutual obligations whereby each obligor owes an equally liquidated and demandable debt to the other." Hebert v. Insurance Center, Inc., 97-298, p. 8 (La.App. 3 Cir. 1/7/98); 706 So.2d 1007, 1012 (citing Ducote v. City of Alexandria, 95-1197 (La.App. 3 Cir. 3/6/96); 670 So.2d 1378), writ denied, 98-0353 (La. 3/27/98); 716 So.2d 888. The validity of an employer's deductions is a question of fact which will not be disturbed absent manifest error. Henderson v. Kentwood Spring Water, Inc., 583 So.2d 1227 (La.App. 1 Cir.1991). In Rosell v. ESCO, 549 So.2d 840 (La.1989), the Louisiana Supreme Court summarized the manifest error standard of review as follows:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable ... Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.
Id. at 844 (citations omitted).
The record reveals conflicting testimony regarding the procedure concerning overpaid sick leave. Thomas Forlander testified that employees were to pay back money paid to them by mistake. However, Carol Kincel testified she knew of no company policy regarding *990 repayment of sick leave. Marla Ratzlaff testified to the same effect. On cross examination, Gary Simon testified the company did not do anything about an employee receiving additional sick time. Additionally, Debbie Berrube, an APS employee in the Operations department, testified she did not know how the situation of taking too many sick days would be treated.
Faced with this conflicting testimony, the trial court found Ms. Winkle did not owe APS the debt of repayment of overpaid sick time. The court found APS failed to carry its burden of proof regarding set off.
Upon review, we note the only witness who testified that APS required its employees to repay overpaid sick time was Thomas Forlander, APS's president. The other witnesses who testified regarding this issue were seemingly unaware of such a policy. Because of this dispute concerning APS's policy regarding overpaid sick time, we find no error in the trial court's determination.

Entitlement to Ms. Winkle's medical records
In brief, Ms. Winkle asserts her medical records are irrelevant to this case because there was no company policy requiring an employee to verify time off for sick leave by providing a doctor's excuse or other medical record. APS also concedes that, prior to Ms. Winkle's actions, it did not require its employees to have doctor's excuses; however, an employee was not permitted to take sick leave unless they were sick.
The trial court ordered Ms. Winkle to provide a medical release to APS for each of the doctors she saw during her employment to give to APS the list of days for which Ms. Winkle received medical treatment from them from October 19, 1992, until October 27, 1995. Upon review, the record indicates that a doctor's excuse was not required for an employee to take sick leave during Ms. Winkle's employment with APS. Marla Ratzlaff testified she had never been asked to provide a medical excuse when taking a sick day. Additionally, Rick Lavergne testified that the requirement of providing a doctor's note to get paid for sick days was not in place during Ms. Winkle's period of employment.
Based upon our review of the record, we find no manifest error regarding this issue.

Good faith of APS
APS urges, in brief, that it relied on offsets and credits allegedly owed to it, as set forth in its fourth assignment of error. APS also contends that the fact that the trial court did find in its favor regarding the thirty-nine hours of claimed vacation leave for the year 1994-1995 demonstrates there was, in fact, a good faith dispute which serves as an equitable defense.
Ms. Winkle states that she made demand on APS for vacation time she claimed due her, but was unsuccessful. She states that defense counsel called her a liar and that this attitude indicates both APS and its counsel "would do everything they could to see that she would not get a single dime from APS."
Without elaboration, the trial court found APS in bad faith in failing to pay Ms. Winkle her earned vacation pay.
The applicable statute is La.R.S. 23:632, which provides, in pertinent part:
Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages.
Under the provisions of La.R.S. 23:632, to recover penalty wages, the claimant must show that "(1) wages were due and owing; (2) demand for payment thereof was made where the employee was customarily paid; and (3) the employer did not pay upon demand." Hebert, 97-298, p. 9; 706 So.2d at 1013. Although equitable defenses are not expressly provided for in the statute, the Louisiana Supreme Court has interpreted the statute as a "coercive means" to compel an employer to pay an employee within the time limits set forth in La.R.S. 23:631. Beard, 97-1784, p. 7; 707 So.2d at 1236. Accordingly, the court has held "that the penalty must be strictly construed and may *991 yield to equitable defenses." Id. If there is "`a good-faith non-arbitrary defense to liability for unpaid wages, i.e., a reasonable basis for resisting liability'", the court may refrain from imposing penalty wages upon the employer. Id. quoting Carriere v. Pee Wee's Equipment Co., 364 So.2d 555, 557 (La. 1978).[2] "Reliance on an unlawful company policy does not constitute a good faith non-arbitrary defense to liability for unpaid wages." Beard, 97-1784, p. 9; 707 So.2d at 1237.[3] "`Where there is a bona fide dispute over the amount of wages due, courts will not consider failure to pay as arbitrary refusal and generally will refuse to award penalties.'" Hebert, 97-298, p. 9; 706 So.2d at 1013 (quoting Barrilleaux v. Franklin Found. Hosp., 96-0343 (La.App. 1 Cir. 11/8/96); 683 So.2d 348, writ denied, 96-2885 (La.1/24/97); 686 So.2d 864). The issue of APS's bad faith is a question of fact. Accordingly, it is subject to the manifest error standard of review. Hebert, 97-298; 706 So.2d 1007; Domite v. Imperial Trading Co., Inc., 94-16 (La.App. 3 Cir. 8/3/94); 641 So.2d 715.
The record reveals Ms. Winkle has satisfied her burden of proof under La.R.S. 23:632, thereby initially establishing her entitlement to penalty wages, as she has met each of the Hebert elements. She has proven APS owed her earned vacation pay, as this is an "amount then due under the terms of employment" under La.R.S. 23:631. She made both oral and written demand upon APS at its place of business, which is where she was customarily paid, and APS did not pay upon demand.
The question now becomes, under Beard, whether APS has proven a reasonable basis for resisting liability for unpaid wages. In her suit, Ms. Winkle has claimed eighty hours of earned but unused vacation for the year 1995-1996 and thirty-nine hours of vacation for the year 1994-1995. In its ruling, the trial court found in favor of APS regarding the thirty-nine hours claimed for the year 1994-1995, as it found Ms. Winkle failed to carry her burden of proving she had received authority to "carry over" these hours into the following year as required by APS policy. It is, therefore, evident from the record that a bona fide dispute concerning the amount of wages due existed. Because of this dispute, we find the trial court committed manifest error in awarding penalty wages against APS.

Attorney's fees
In brief, APS contends that La.R.S. 23:631 is inapplicable to the present case.[4] Further, APS urges that the record contains no evidence of the time expended by Ms. Winkle's attorney. APS additionally contests the amount of attorney's fees awarded.
Ms. Winkle urges the trial court correctly awarded attorney's fees based upon APS's lack of good faith in its failure to pay her the vacation time she was due. She also urges that imposition of attorney's fees are within the discretion of the trial court.
La.R.S. 23:632 provides, in pertinent part:
Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.
Unlike penalty wages, there are no equitable defenses available to preclude imposition *992 of attorney's fees where a "wellfounded suit" for wages is filed. Beard, 97-1784, p. 9; 707 So.2d at 1237; Carriere, 364 So.2d 555. Jurisprudence indicates a suit is well-founded where the plaintiff has received judgment. See Beard, 97-1784; 707 So.2d 1233; Hebert, 97-298; 706 So.2d 1007.
As set forth above, La.R.S. 23:631 applies to the present case, as vacation pay constitutes an "amount then due" under the statute. La.R.S. 23:632, therefore, also applies. In accordance with established jurisprudence, we find Ms. Winkle's suit to be well-founded, as she received judgment in the trial court. As such, the trial court's decision to award attorney's fees was proper.
Although the record fails to disclose the amount of time expended by Ms. Winkle's attorney in preparing her case, this court may fix the amount of attorney's fees from the record. See Cochran v. American Advantage Mortg. Co., 93-1480 (La.App. 1 Cir. 6/24/94); 638 So.2d 1235; Mitchell v. Turner, 588 So.2d 1305 (La.App. 2 Cir.1991). Factors to consider in determining the reasonableness of attorney's fees include the following:
(1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances involved; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge.
Rivet v. State, Dept. of Trans. and Dev., 96-0145, p. 11-12 (La.9/5/96); 680 So.2d 1154, 1161.
The trial in this matter lasted two days, with nine witnesses testifying. Furthermore, numerous filings are contained within the record, evidencing extensive preparation. As it is evident that Ms. Winkle's attorney spent much time in preparation for trial, we find no error in the trial court's award of $2,500.00 in attorney's fees.

Additional Attorney's Fees
Lastly, we note that Ms. Winkle has requested additional attorney's fees for the preparation and presentation of this appeal. Although the Beard court did award the plaintiff additional attorney's fees, in that case, it is unclear whether the plaintiff had either answered the appeal or herself taken an appeal. In granting the plaintiff's request for additional attorney's fees, the court focused on the policy behind La.R.S. 23:632 in encouraging employees to make demand on their employers for their wages and inducing attorneys to accept those cases. Beard, 97-1784; 707 So.2d 1233. Here, however, it is clear that Ms. Winkle has neither answered the appeal nor herself taken an appeal. Accordingly, we are unable to award additional attorney's fees. See La.Code Civ.P. art. 2133; See also Charles v. LeBlanc, 93-871 (La.App. 3 Cir. 3/2/94); 633 So.2d 866, writ denied, 94-1314 (La.9/2/94); 643 So.2d 148.

DECREE
For the reasons set forth above, the portion of the trial court judgment finding the defendant in bad faith and imposing penalty wages against it for its failure to pay the plaintiff earned vacation pay is reversed. In all other respects, the judgment of the trial court is affirmed. All costs of this appeal are to be divided equally between the plaintiff, Gail A. Winkle, and the defendant, Advance Products & Systems, Inc.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
NOTES
[1] Acts 1997, No. 1398 designated the existing text as subsection A and added subsection B, which allows the employer reimbursement from an employee for certain preemployment examinations if the employee terminates employment within 90 days.
[2] We note that a panel of this circuit found that La.R.S. 23:632 is not subject to any equitable defenses, as such defenses "make less effective... the obvious intent of the legislature in adopting this statute." Domite v. Imperial Trading Co., Inc., 94-16, p. 6 (La.App. 3 Cir. 8/3/94); 641 So.2d 715, 719 (footnote omitted). However, another panel of this circuit declined to follow the Domite court's reasoning. See Hebert v. Insurance Center, Inc., 97-298 (La.App. 3 Cir. 1/7/98); 706 So.2d 1007.
[3] In its original brief, APS relied, in part, on its "uniformly enforced" policy regarding non-payment of unused vacation time. However, in its reply brief, APS notes the Beard decision held that reliance on an unlawful company policy is not a good faith non-arbitrary defense to liability for unpaid wages, although APS denies that its policy was unlawful.
[4] We note that appellant cited the pertinent article as La.R.S. 23:651, but its substantive arguments involve La.R.S. 23:631.